Thank you. Good morning. May it please the court. My name is Dan Siegel. I represent the plaintiff and appellant Sharon Henry in this case. On March 15, 2008, Sharon Henry became enmeshed in a Kafkaesque experience. It was as though she were in a dream where she were accused of wrongdoing and had suddenly been struck mute or was speaking in a foreign tongue so that no one could understand her explanation or allow her to respond to the accusations. This is almost a perfect storm. Two people with the same name at the same bank, but one of them is in a credit card and one of them isn't. They pick the wrong one, and then all It was just an amazing factual situation, and it will never occur again. It was an amazing factual situation, Your Honor. I agree, but it was not handled correctly. It was handled negligently by the bank, and it was handled incorrectly by the officers who failed to make obvious, reasonable inquiries with respect to the check. Such as? I can – if I may, Your Honor, I'd like to begin with the bank's errors, because I think the bank's errors led to your officer's errors, if that's okay. Sure. I'll remember. So the bank had two duties here, as we point out. One, it was perfectly entitled to have an anti-theft program, an anti-fraud program, but as the California Supreme Court said in the Safeway case, they had an obligation to implement that program with due care, so as not to identify wrongfully people who were innocent. It also has, as the California Court of Appeal has said in the Bullis case, a general duty of care to its customers. So Ms. Mendoza, who is championed by the bank as an expert, as a competent person, made a series of mistakes. The first one she made was that she looked and relied upon a database which she knew did not contain credit card-only customers. She knew that. Secondly, after she discovered the wrong Ms. Wilkinson, she made two additional mistakes. The correct Ms. Wilkinson had the same address as the plaintiff, and that was verified when Ms. Mendoza called Priority Services and was told the check was good and that the address on the check matched. And then she should have noticed and did notice that the same address was on Sharon Henry's deposit slip. So when she found another Ms. Wilkinson in her database, a light should have gone off. So she dishonored that check. We can't, I guess, look at the police report because it's immunized under federal law, correct? We can't look at her filing a police report. So opposing counsel says, well, there wasn't enough evidence of serious emotional distress merely from the act of dishonoring a check, even erroneously. So that's very – if your factual statements right now go to the negligence claim, isn't it really a question of were there serious enough damages? Your Honor, I would submit that three decisions of the California Supreme Court upon which we rely require that the issue of damages be tried to a jury. The issue of damages cannot be determined based upon a couple of pages of interrogatory responses where Ms. Henry was responding to a query as to requiring her to describe all of her damages caused by both the officer's arrest and the bank's negligence. And she did, and did not differentiate between the two. And the district court, certainly, I'm sure, doing the best that it could, said, well, I'm going to separate which ones flow from the arrest and which ones flow from the bank's actions and decide that that was not enough. But, you know, in Poole v. Safeway, which is very much on all fours with this case, except that it didn't involve a bank, but where there were similar errors in attempting to implement an anti-fraud program, the Supreme Court of California says, well, the amount of damages is a jury question. In the State Rubbish case, which is also from the California Supreme Court, the Supreme Court says very clearly if the elements of a claim of negligence have been established, the issue of damages should go to the jury. So as I understood what the district court, if I'm recalling right, was getting at was where the standard is for this sort of emotional distress, the damages must be severe, substantial, and enduring. As a matter of law, the district court said there weren't allegations, there wasn't any evidence of that, and so summary judgment was appropriate. Is it your position that summary judgment is never appropriate on a damages issue, regardless of what evidence is submitted? I wouldn't go that far, Your Honor. I think that if the evidence is undisputed and clearly teed up, and a plaintiff were to say my damages consisted of being annoyed, and that's all the plaintiff said, a court could grant summary judgment. But here the plaintiff has talked about insomnia, feelings of humiliation, embarrassment, concern. I mean, my client, and I think it's relevant because every person is different, my client is a member of the bar, an applicant for a judgeship, a deputy district attorney in San Mateo County, and for her to go through this sort of experience at her stage of life and with her expectations is perhaps something that a jury would consider to be more serious and more worthy. But we're only talking about dishonor here, right, dishonor of the checks. Excuse me. Because the subsequent events, as I understand it, are not at issue with respect to the negligence claim against the bank. Am I mistaken on that? You're not mistaken, but on the cold record before you, dishonor could seem like dishonor. Here, my client was forced to sit in the lobby of the bank for a period of time while calls were made. Then the parents of the wrong Ms. Wilkinson come storming through the door, as one of the police officers indicated, accusing her, and she is sitting there feeling humiliated. And that all happened before the arrest. And so there are damages. And again, I think in the examination of the record, the issue of the amount of damages was not really teed up in a thorough manner for the Court to address. I would submit, Your Honor, that the issue of damage was kind of an afterthought, because the parties did not think that the district court's decision was going to be based on damages, especially after the first district court judge, Judge Breyer, said in ruling in the initial anti-slap motion, there's enough here for the case to go forward on negligence. And so there we were. Scalia. Is the district court wrong by taking this attitude, which is I have to separate out the damages that flow from dishonoring the check and those that flow from the criminal accusation, so to speak, and then would it be valid for a district court to say, well, if I have to put all of the elements that relate to the criminal accusation on the side, then what happened is a check was dishonored, and within a couple of hours, the bank recognized the mistake, and then put all of the damage package in the other claim. I think you're saying that's wrong, that the judge should have allowed a jury to make a case attributable approximately caused by the dishonor alone. I would submit that would be the case, and that further, if I may, I would like to address the argument on probable cause, because I think that ultimately our view is that this case should be tried as a whole against both sets of defendants, and it should be the jury's decision to apportion damages between the bank and the city and county of San Francisco. And I would submit that this Court's decision in Merriman and the decisions which followed Merriman, including Hutchinson, Fuller, and the others we've cited, compelled the officers to make reasonable inquiries here and to have at least given my client the opportunity to explain herself. I mean, this could have been avoided had there not been such a rush to judgment by all of the defendants. Ms. Henry was prepared to say, here is the person who wrote me this check. We live two blocks away. She'll come running up here and show you her identification if you want her to do that. And this matter would have been resolved. And although we are not focusing today on the issue, I very strongly believe that if Ms. Henry had looked like I look today in front of this Court, it never would have happened. It never would have happened. The bank and the officers would have given me an opportunity to explain where I got the check and who wrote the check. And so, but putting that question at least a little bit to the side as we proceed, the officers themselves, just as Ms. Mendoza, admitted violations of policy, right? Both officers said that in these situations, their practice and procedure and they had been trained to attempt to contact the maker of the check, because as one of them said, that usually resolves the matter. And they didn't do that. And one of the officers said, and I know it's not legally binding on the issue of probable cause. I didn't think I had probable cause, the officer said. I thought I had reasonable suspicion to make a detention. Now, again, that's not binding on whether there was probable cause, but it's one of the circumstances I think the Court should consider under Illinois v. Gates and under Merriman in determining whether, in light of that point of view that the officer had at the time, he should have given Ms. Henry an opportunity to explain herself. And that's all we're really contending. If she had had an opportunity to explain herself, this would not have happened. I'd like to reserve the rest of my time if I may. Good morning again, Your Honor. I'm still Jan Chilton, but this time I'm representing Bank of America. The city attorney is here to represent the police officers, and we've decided to split our time down the middle, so I'll have 7 1⁄2 minutes if you could. I'll try and keep track. All right. From what I hear today, the case against Bank of America comes down to a relatively simple question, which is did Ms. Henry present evidence that she suffered the kind of emotional harm that is required to get to a jury in California under California law from the dishonoring of her check and nothing else? Because she concedes in her reply brief at, well, I can get you the page here. Yeah, there it is, page 9, that the Anunzio-Wiley Act immunizes the bank from any liability as to events that flowed from the report to the police and its later developments. I think that the district court, I thought, relied on the California litigation privilege for the calls to the Wilkinsons, but maybe the calls to the Wilkinson is no longer before us? Well, I didn't hear an argument today that Ms. Henry suffered any emotional distress from the call to the Wilkinsons. He was mentioning that she was sitting on the bench and calls were being made to the parents, but I thought that was no longer before us, that that argument was not raised again. Well, I think you're right, Your Honor, that the call to the Wilkinsons certainly would not be an appropriate basis on which to hold the bank liable because of the litigation privilege, which covers investigation of fraud as well as the subsequent report to the police. So where do we look to see what emotional distress damages Ms. Wilkinson or Ms. Henry suffered from the dishonor of her check? We look to what she said in her response to interrogatories, which was that plaintiff is making a claim for mental and emotional distress usually associated with physical injuries caused by negligence. And then she testified at her deposition that the only physical injuries she suffered were as a result of being, in her view, manhandled by the police at the time they made her arrest. Well, they – the opposing counsel points out that that doesn't rule out also having suffered emotional distress not associated with physical injuries. That may be true, but the burden is on Ms. Henry in opposing a summary judgment motion to come forward with some evidence of that. It may not rule it out, but she has to show there's something there, and she didn't. So he references insomnia, I think she also mentioned headaches, concerns. She may suffer all of those things, but the chink in her armor, if I may, is causation. She has to show that those emotional problems are suffered as a result of the dishonor of the check, not anything having to do with her arrest. And she never offered any testimony to that effect. So you're agreeing with what I said earlier, that the district court would be proper in saying, let me hypothecate a situation in which the police were never called. There was just dishonor, and on that basis grant summary judgment. You're saying that was okay? Yes. All right. Okay. Well, I would hate to give the city more than it's due, but unless there are other questions, I will sit down and let the city decide. All right. Thank you. Thank you. Good morning. Leela Mongin on behalf of the city and county of San Francisco and officers Calvin Chow and Raymond Lee. In this appeal, Henry challenges the district court's grant of summary judgment in the San Francisco defendant's favor on only two of her claims. First, her Fourth Amendment false arrest claim, and second, her state law false arrest and civil rights claims. We believe the district court's opinion was correct, and we ask the court to affirm on both questions. Henry claims essentially that there can be no probable cause because the officers didn't take certain investigative steps at the scene. She says they should have thoroughly interviewed her and called her partner, Kathleen Wilkinson, while they were still at the bank. But that's the wrong way to look at probable cause. First, there are no cases setting forth a per se rule that officers can never have probable cause unless they conduct a thorough interview of the suspect and call a witness. Second, probable cause is a totality of the circumstances test. You look to see what the officers knew at the time, and you decide if that was sufficient for probable cause. If it was, that's the end of the story. You don't then speculate as to how other possible paths that the investigation could have taken. As in Hunter v. Bryant, which we cite at page 9 of our brief, the court should not now come up with alternative theories about how the officers could have viewed the other the evidence presented to them. Well, what do we do with Merriman and Gardenhire, which suggests that failure to investigate obvious things could undercut probable cause? Those cases, Your Honor, I think that those are different because the difference here is there was no obvious objective evidence suggesting that Ms. Henry was not, in fact, involved in a crime. The evidence that suggested that was merely Henry's own protestations of her innocence and her claim that she could give them a phone number that they could call that would reach the person who actually wrote the check. There was no telephone number on the check, so the only way the officers could have reached the real Ms. Wilkinson was to call the number that the suspect was giving them. But as a matter of common sense, we can see why the officers wouldn't necessarily call a phone number given to them by a suspect. Even though she claimed it would exonerate her, it could have tipped off an accomplice and it might not resolve the issue anyway because the officers may not be able to confirm over the telephone that she is who she says she is. We don't know for sure that she could have been able to come down to the bank. All of this is speculation about what might have happened had they taken a different path. I'm surprised that you would say that it's acceptable for the police. Somebody says that they are not guilty. I don't know if she showed her credentials or not and that would certainly be significant. But even to make a phone call in order to disprove this suspect's story, you call up a number and you say, who's this? And the person's going to say, Michelle, whatever her name is. Obviously, there are questions that you could ask, which is not giving up the game, that you could quickly find out what the story is. And in ten seconds, you would have had that person coming to the bank and we wouldn't even be here. I mean, that seems to me it's a little bit cavalier to say the police just the default provision is just arrest somebody. Well, Your Honor, they intended to call the maker of the check. They intended to do that as part of their investigation. And they did testify that they were trained to do that as part of their investigation, although they did not necessarily say that they were trained to do that at the scene. They were going to continue the investigation at the police station. And I think it's very easy now to look back and say how quick and easy it would have been to make that call and how quick and easy that would have resolved the case. But the fact is we don't the officers didn't know that at the time. And it's there's no evidence on how that could have changed things and whether it really would have been that quick and easy if they had made that phone call. Scalia's not going anywhere, and she's not causing a fuss. Just, okay. That's true, Your Honor. Mr. and Mrs. Wilkinson were there, and Officer Chow testified that Mr. Wilkinson was extremely agitated. He was concerned about him interfering with the investigation if they stayed at the bank. Both officers testified that, or at least one of them testified that they have concerns about conducting an investigation in a crowded bank lobby. And we would submit that once they had probable cause, which they did with the various evidence that they had gathered at that point, that it was well within their discretion to decide that it was more appropriate to continue the investigation at the police station. I'd like to call the ---- At what point were the officers advised of the contact the bank manager made with the wrong Wilkinson? Ms. Mendoza told the officer, told Officer Chow about that when he arrived at the bank. When he first arrived at the bank, he went and spoke very briefly to Ms. Henry, and then he went and spoke to Ms. Mendoza, who told him about her contacts with the parents. And what does the record show that she told the police officers about that contact? She said that she had contacted the parents and that they had confirmed that their daughter was in Scotland and would not have written this check. Excuse me, Your Honor. Yes. And then he actually spoke to Mr. Wilkinson and asked him to look at Ms. Henry and see if he recognized her as one of his daughter's friends, and he confirmed that he did not. And he called 911? Mr. Wilkinson had called 911, yes. Did he do that before he got to the ---- He did that before he got to the bank? Yes, sir. I don't want to go through the ---- all the evidence that the officers had in front of them, as it's detailed in our brief at pages 6, 7, and 15. There is one piece of evidence that we did not include in our brief but was on the record before the district court, and I would like to call the court's attention to that. And that is the fact that there was different handwriting on the check. Chau noticed, and Henry testified, that her partner had written out the name Sharon Henry and had signed the check, but that Ms. Henry had written in the dollar amount and had written out the words for the dollar amount as well. I'd submit that's an additional piece of evidence that could have informed probable cause. I would also just like to quickly address the race claim. There is simply not a shred of evidence that the officers treated her any differently than they would have treated someone else in this situation. This was a nearly $30,000 check. She was asking for $1,000 back in cash. They'd received a complaint from a person who they had worked with before and believed to be reliable and professional. They were taking this very seriously. The way that they acted is simply not consistent with a racial bias theory that they saw that she was black and then decided to come up with a reason to arrest her. In conclusion, Your Honor, I would simply note that the city regrets that Ms. Henry had to go through this. We don't doubt that it was humiliating, that it was uncomfortable for her. But police officers have an investigatory function that they have to perform. And within the bounds of the law, they should be given discretion to carry out their investigations how they see fit. At what point did the police officers call the correct Ms. Wilkinson? They actually never had the opportunity to do that, Your Honor. Officer Chau was planning to do that at the station. But they took her to the station. They took Ms. Henry to the station. That's correct. Did they ever make a phone call to the correct Ms. Wilkinson? No. Officer Chau didn't have an opportunity to do that because Ms. Wilkinson actually showed up at the bank before he had a chance to do that. And so he spoke to her when she – The real Ms. Wilkinson. Correct. When she arrived at the bank. And that was at the bank. She was at the bank. But Officer Chau and Ms. Henry were back at the station at that point. So he spoke to her, what, over the phone to the bank? Yes. She found – she ran into a police officer who was outside of the bank. And that officer radioed to Officer Chau and told him that there was a Ms. Wilkinson there looking for her partner who had gone there to cash a check. And Officer Chau confirmed with Ms. Mendoza that there was a mistake. And at that point released Ms. Henry. And how long was she at the station before that took place? It's a little unclear. Henry testified that it was no more than, I believe, an hour and 20 minutes total. At no point did the police officers initiate the telephone call to what plaintiff contends is the real Ms. Wilkinson. That's correct, Your Honor. I would note, however, Officer Chau, who was conducting the investigation, was not back at the station the entire time that Ms. Henry was there. He stayed behind at the bank to gather a statement from Ms. Mendoza and to get copies of the documentation that she had gathered about the account. Unless there are further questions, the city will rest on its brief. Thank you. Thank you. Thank you. Very briefly, on page 17 of our reply brief is a statement from the record as to Ms. Henry's emotional damages, which are apart from the physical injuries she suffered during the course of her arrest. One of her damages was she felt betrayed by the bank, where she'd been a customer for 25 years. The Officer Chau and Judge Wallace, I think you hit on an issue. They took Ms. Henry to the police station. They said they arrested her not because of probable cause, but because the other Ms. Wilkinson's father was making a fuss. The way I see that, the bank's negligence in calling the wrong Wilkinsons brought in the wrong Wilkinson who were upset, and then that led to the officers deciding not to make the simple phone call that Judge Garbus was referring to. And they never made it. It was the real Ms. Wilkinson wondering what happened, came to the bank, ran into another police officer, a third officer, and wanted to find out what happened to Ms. Henry that led to a conversation between the real Ms. Wilkinson and Ms. Mendoza. And it was one of those, you know, Gilder Rattner moments from the old Saturday night live show, which said, oh, well, never mind, I guess we arrested the wrong person. You know, it just seems like this was so predetermined when the wrong Ms. Wilkinson's parents spoke with the bank. One of the things they told Ms. Mendoza, my daughter's credit limit is far too high for her credit to be far short of $27,500. Ms. Mendoza had already been told by Bank Priority Services that this check for $27,500 was within the maker's limit. If Ms. Mendoza was the sharp bank employee she is claimed to be, that would have set off another light. They took Ms. Henry down to the station, they chained her in a cell to a lead pipe, and the only further investigation they did was to see whether she had any criminal history, which of course she did not. Unknown, of course, how long she would have remained there had not the correct Ms. Wilkinson come to the bank looking for her. The San Francisco police did nothing to expedite this investigation. Did they book her there? She was not booked. She was simply held in a cell. Thank you. Thank you. The case of Henry v. Bank of America is submitted and we are adjourned for the week.
judges: Garbis, Wallace, Ikuta